**DUNAWAY**

v.

**FORD MOTOR COMPANY.**

Court of Common Pleas of Ohio,
General Division, Scioto County.

No. 97–CIH–098.

Decided Oct. 19, 1998.

*John W. Thatcher,* for plaintiff.

*Porter, Wright, Morris & Arthur, Karl J. Sutter* and *Erica L. Armbrus,* for defendant.

HOWARD H. HARCHA III, Judge.

On January 17, 1997 plaintiff, Beth A. Dunaway, purchased a 1996 Ford Mustang from Oberling Ford, Inc., in Portsmouth, Ohio. She traded a 1989 Chevrolet Astro Van for the Mustang. The circumstances surrounding this trade give rise to the present controversy.

At the time of the transaction the plaintiff owed $5,181.89 on the Chevrolet Astro Van. Oberlings estimated that the trade-in value of the Chevrolet Astro Van was $2,700. However, in facilitating the deal, Oberling Ford gave the plaintiff an allowance of $5,300 for the used vehicle. The purchase price of the vehicle was increased to offset the inflated value.

The overallowance of $2,600 allowed her to pay off the negative equity in the van.

Henry Oberling III testified that this figure was added to the actual purchase price of the Mustang. This caused the stated purchase price of the new vehicle to reflect a higher figure than what the plaintiff actually paid for the vehicle. Prior to trial, the parties stipulated that the 1996 Ford Mustang was defective under Ohio Lemon Law and that the plaintiff was entitled to compensation under the statute.

Monetary amounts before this court constituting trade-in allowance and trade value were determined by representatives of Oberling Ford, Inc. Oberling Ford valued the plaintiff's 1989 Chevrolet Astro Van at $2,700. The plaintiff testified that her car was worth between $5,000 and $6,000 retail when she traded to Oberling Ford. Her testimony also revealed that Oberling Ford sold the 1989 Astro Van for $4,800 several months later. During cross-examination, Mr. Oberling admitted that the sum of $2,700 constituted a trade-in value and was not the fair market value of the automobile.

Ohio's Lemon Law provides in R.C. 1345.72(B):

"(B) If the manufacturer, its agent, or its authorized dealer is unable to conform the motor vehicle to any applicable express warranty by repairing or correcting any defect or condition that substantially impairs the use, safety, or value of the motor vehicle to the consumer after a reasonable number of repair attempts, the manufacturer shall, at the consumer's option, and subject to division (D) of this section replace the motor vehicle with a new motor vehicle acceptable to the consumer or accept return of the vehicle from the consumer and refund each of the following:

"(1) The full purchase price including, but not limited to, charges for undercoating, transportation, and installed options;

"(2) All collateral charges, including but not limited to, sales tax, license and registration fees, and similar governmental charges;

" * * *

"(4) All incidental damages, including any reasonable fees charged by the lender for making or canceling the loan."

R.C. 1345.71(F) defines "full purchase price" as follows:

"[T]he contract price for the motor vehicle, including charges for transportation, dealer-installed accessories, dealer services, dealer preparation and delivery and collateral charges; all *finance*, credit insurance, warranty and service contract *charges incurred* by the buyer; and all sales tax, license and registration fees, and other government charges." (Emphasis added.)

The defendant has directed this court to *Fortner v. Ford Motor Co.* (Feb. 9, 1998), Stark App. No. 1997CA00177, unreported, 1998 WL 172862. This case held that the express language of the Lemon Law was intended to make the consumer whole and to restore the purchaser to a position he or she occupied before acquiring the lemon.

The defendant is asking this court to go behind the purchase agreement and base its decision upon the testimony offered in the courtroom. The facts of this case are clear. The plaintiff owed more on the Chevrolet Astro Van than it was worth. However, the amount of negative equity is dependent upon the value of the vehicle that was traded. The amount of negative equity can be determined only by ascertaining the fair market value of the 1989 Chevrolet Astro Van at the time it was traded. Mr. Oberling admitted that the $2,700 value placed upon the van was not the fair market value. It is well recognized that a dealership does not offer fair market value but a lower amount so that it can subsequently make a profit when it resells the vehicle. The dealer is in a position to offer as little as possible to make the transaction so it can make more money in the future. There was testimony that the Chevrolet Van was subsequently sold by Oberling Ford for $4,800. There was no testimony presented as to what had been done to the vehicle prior to its subsequent sale.

This court is also concerned with the concept of opening up every transaction that falls under Ohio's Lemon Law. The defendant wants this court to go behind the deal and base a decision on testimony rather than the written contract. Following this procedure would dictate that every transaction could be analyzed to determine the fair market value of every trade-in vehicle at the time of sale. This would create chaos for the courts and further complicate the issues to be decided under Ohio's Lemon Law.

6

■ This court agrees that the purpose of Ohio's Lemon Law was to put the purchaser in the same position that he or she occupied before acquiring the defective automobile. This court submits that a purchaser is never placed in the same position when he or she has traded in a vehicle towards the purchase of the lemon. In all circumstances, the purchaser would never receive the fair market value of the used automobile. Instead, the purchaser would have received only a wholesale or trade-in value for the vehicle, which could be several thousand dollars below its fair market value. Under those circumstances, even if Ohio's Lemon Law were to compensate the purchaser the stated purchase price for the contract, he or she would still have lost a considerable amount of money on the trade-in and not be in as good a position as before the transaction.

In light of the foregoing, this court believes that it would be a mistake to go behind the written contract of the parties. The plaintiff is granted judgment against defendant Ford Motor Company in the amount of the purchase price of the vehicle plus interest paid, costs, and interest on the judgment.

The defendant shall submit a written response to the plaintiff's request for attorney fees within fourteen days of the date of this decision.

The plaintiff shall prepare an entry consistent with this decision.

*Judgment accordingly.*

JUDGMENT ENTRY

Decided Nov. 2, 1998.

HOWARD H. HARCHA III, Judge.

This matter came on for hearing and based upon the decision of the court filed October 19, 1998,

IT IS ORDERED that the defendant pay to the plaintiff $1,118.11 for down payment; $890 for Ford Extended Service Contract; $88 court costs; and $6,576 for twenty-one payments at $313.19, less a $500 rebate; the defendant to issue a check jointly to Desco Federal Credit Union and the plaintiff, Beth Dunaway. The court finds that the total amount due the plaintiff for her individual payments is $8,173.10, and the amount due the Desco Federal Credit Union through November 5, 1998, is $16,075.46.

Upon the payment as hereinbefore ordered the plaintiff is ORDERED to deliver the vehicle to Henry Oberling Motor Company free of all damage except reasonable wear and tear, and to deliver a title, free and clear, to the attorney for the defendant.

The court approves attorney fees to John W. Thatcher, attorney for plaintiff, in the amount of $6,891.75.

Costs assessed to the defendant.